Matter of Charlie RR. (Kimberly QQ.--Scott RR.) (2020 NY Slip Op 08141)





Matter of Charlie RR. (Kimberly QQ.--Scott RR.)


2020 NY Slip Op 08141


Decided on December 31, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: December 31, 2020

529829

[*1]In the Matter of the Appointment of a Guardian of the Property of Charlie RR. Kimberly QQ., Respondent; Scott RR., Appellant. (Proceeding No. 1.)
In the Matter of the Appointment of a Guardian of the Property of Cullen RR. Kimberly QQ., Respondent; Scott RR., Appellant. (Proceeding No. 2.)
In the Matter of the Appointment of a Guardian of the Property of Charlie RR. Scott RR., Appellant; Kimberly QQ., Respondent. (Proceeding No. 3.)
In the Matter of the Appointment of a Guardian of the Property of Cullen RR. Scott RR., Appellant; Kimberly QQ., Respondent. (Proceeding No. 4.)

Calendar Date: November 20, 2020

Before: Egan Jr., J.P., Clark, Aarons, Reynolds Fitzgerald and Colangelo, JJ.


Scott RR., Ocean City, New Jersey, appellant pro se.
Buck, Danaher, Ryan and McGlenn, Elmira (John J. Ryan Jr. of counsel), for respondent.
Paul A. Sartori, Elmira, guardian ad litem.



Egan Jr., J.P.
Appeal from an order of the Surrogate's Court of Chemung County (Rich Jr., S.), entered June 24, 2019, which, among other things, granted petitioner's applications, in proceeding Nos. 1 and 2 pursuant to SCPA article 17, to appoint her as the guardian of the property of the infant children.
In September 2015, an intruder entered a home in Steuben County while a 35-year-old mother and her two young children (born in 2008 and 2012) were present and bludgeoned the mother to death with a maul handle. The mother's husband and father of the subject children was not present but arrived home shortly after midnight and discovered the mother's body. The father's former employee and tenant was arrested for committing the actual killing and the father was charged with, among other things, murder in the first degree on the ground that he procured the commission thereof. Following a jury trial, the father was convicted of murder in the first degree and murder in the second degree and thereafter sentenced to life in prison without the possibility of parole.[FN1]
In October 2015, Family Court granted an order temporarily removing the children from their home and placed them in the care and custody of Kimberly QQ., the maternal aunt (hereinafter the aunt), and her husband, Corey QQ. (hereinafter the uncle). A caseworker from the Steuben County Department of Social Services was assigned to work with the family, following which, the aunt and the uncle immediately engaged in services, including therapy for the children. A Family Ct Act article 10 neglect proceeding was thereafter commenced against the father and, as a result thereof, his parental rights were terminated as to both children upon a finding of severe abuse stemming from his involvement in the mother's murder (see generally Matter of Charlie C. [Thomas C.], 178 AD3d 1450 [2019]). The aunt and the uncle subsequently obtained certification as foster parents, and placement of the children with the aunt and the uncle was changed from a temporary placement to a foster placement.
Following the mother's death, a "Go Fund Me" page was created to solicit donations to support the children and, in turn, an irrevocable trust was established for the children's benefit for the purpose of, among other things, depositing the proceeds thereof.[FN2] In 2017, the aunt filed two petitions — one for each child — seeking to be appointed as guardian of the children's other property (see generally SCPA art 17), which included, among other things, the life insurance proceeds from the mother's death. In 2019, the children's paternal grandfather, Scott RR. (hereinafter the grandfather) filed two competing petitions — one for each child — seeking to have his stepson, Derek SS., appointed as the guardian of the children's property. The grandfather thereafter filed discovery demands seeking, among other things, certain financial records pertaining to the aunt and the uncle, including income and expense records and authorizations [*2]for the release of bank records, as well as trust and medical records. The aunt opposed these discovery demands and moved to preclude same, which motion Surrogate's Court granted. Following a joint hearing on all four petitions, Surrogate's Court determined that it was in the best interests of the children for the aunt to be appointed as guardian of their property. The grandfather appeals.
Initially, the grandfather contends that Surrogate's Court erred by precluding him from obtaining certain discovery. We disagree. It is well settled "that the trial court has broad discretion in controlling discovery and disclosure, and generally its determinations will not be disturbed in the absence of a clear abuse of discretion" (Mokay v Mokay, 111 AD3d 1175, 1177 [2013]; see Dwyer v Valachovic, 137 AD3d 1369, 1373 [2016]; Matter of Rich, 117 AD3d 1103, 1105 [2014]). Here, the grandfather served a combined discovery demand on the aunt and the uncle seeking to obtain, as relevant here, their checking and savings account records, income and expense records pertaining to the children, and records from the trust. Surrogate's Court appropriately determined that, given the personal nature of the financial information that was requested and in the absence of any indication that said records were indispensable to the grandfather's application (see Saratoga Harness Racing v Roemer, 274 AD2d 887, 888-889 [2000]), disclosure of the aunt and the uncle's personal bank accounts was not relevant to the aunt's application for appointment as guardian of the children's property. Similarly, with respect to the disclosure of trust records, inasmuch as neither the aunt nor the uncle were named trustees of the trust and had no oversight authority with regard thereto, Surrogate's Court properly precluded discovery of said records as they were irrelevant to the ultimate issue before the court. Importantly, to the extent that the grandfather raised concerns over the manner in which the aunt was spending certain funds that were earmarked for the children, the court left open the possibility for further discovery, specifically ruling that, should additional facts come to light during the hearing demonstrating that the aunt had engaged in "improper or imprudent" expenditures, it would not preclude the grandfather from seeking additional disclosure at that time. Accordingly, we perceive no abuse of discretion in the court's determination limiting discovery (see Matter of Ruhle, 173 AD3d 1389, 1392 [2019]; Dwyer v Valachovic, 137 AD3d at 1373; Saratoga Harness Racing v Roemer, 274 AD2d at 889).[FN3]
Turning to the merits, it well established that "[w]hen considering guardianship appointments, the infant's best interests are paramount" (Matter of Denia M.E.C. v Carlos R.M.O., 161 AD3d 853, 854 [2018] [internal quotation marks and citations omitted]; see SCPA 1707 [1]; Matter of Mardin A. M.-I. [Reyna E. M.-I.—Mardin H.], 187 AD3d 913, 914 [2020]; Matter of Autumn B., 299 AD2d 758[*3], 759 [2002]). To that end, a guardianship appointment is generally left to the sound discretion of Surrogate's Court and, as long as said decision is supported by a sound and substantial basis in the record, it will not be disturbed on appeal (see Matter of Christopher P. v Jason Sidney G., 126 AD3d 980, 980 [2015], lv denied 25 NY3d 1182 [2015]).
The evidence at the fact-finding hearing established that the children have lived with the aunt and the uncle since their mother's murder in September 2015. As a result of the mother's death, the children suffered severe emotional trauma that manifested itself in various forms, with the older child exhibiting "hypervigilant" and "fearful" behavior, the younger child demonstrating various regressive behaviors in his mental and emotional development and both children having difficulty sleeping and needing constant care such that the aunt left her full-time job in order to provide and tend to the children's day-to-day needs. The children's caseworker, who has worked with the family since September 2015 through to the present, testified that the children have a very close relationship with the aunt and the uncle and that, since the mother's death, the aunt and the uncle "have done absolutely everything that they could do . . . to support [the] children," including, among other things, engaging the children in therapy and otherwise providing for their physical, mental, emotional and financial well-being.
The grandfather made numerous broad assertions of financial impropriety on the part of the aunt in dealing with the various funds that she has received on the children's behalf. These assertions, however, were speculative and wholly unsupported by the record. Although the aunt candidly graded herself as scoring a "D-" on handling the family's financial matters, there was no credible evidence presented at the hearing indicating that she made any improper or imprudent expenditures with respect to the monies that she has received on behalf of the children.[FN4] To the contrary, following receipt of certain funds that were donated to the children's "Go Fund Me" page, the aunt sought the advice of legal counsel and, although not required to, advocated for the establishment of a trust for the children's benefit, for which she was not designated as a trustee and has no oversight authority. The aunt testified that those monies that she has received that have been specifically earmarked for the benefit of the trust — namely, the fundraising proceeds from a 2017 golf tournament — were appropriately deposited therein.[FN5] Certain other monies that she has received from fundraisers have been deposited into various other bank accounts and have been used either for appropriate household expenditures or otherwise remain in said accounts to be used, as needed, for the children's benefit. The children's caseworker testified that she has not observed the aunt or the uncle make any questionable expenditures nor did she believe [*4]them to have committed any financial improprieties.
Although the evidence at the hearing demonstrated that the grandfather's stepson was a certified public accountant and had the necessary skills to serve as guardian of the children's property, Surrogate's Court aptly noted that he did not have a close relationship with the children, had not seen or spoken with them or the aunt and the uncle since prior to September 2015 and was admittedly unfamiliar with the children's day-to-day needs. The aunt, on the other hand, having taken the children into her home and ably provided for their physical, emotional and financial well-being since September 2015, was simply in a better position to understand and provide for the children's best interests. Finally, considering the events that have led to the necessity of the subject proceedings, to interject the step-sibling of the father into the financial affairs of the children would be unwise and likely detrimental to the children's best interests. Accordingly, we find that there is a sound and substantial basis in the record to support Surrogate's Court's appointment of the aunt as the guardian of the children's property and we decline to disturb same (see SCPA 1707 [1]; Matter of Mardin A. M.-I. [Reyna E. M.-I.Mardin H.], 187 AD3d at 914; Matter of Christopher P. v Jason Sidney G., 126 AD3d at 980).
Clark, Aarons, Reynolds Fitzgerald and Colangelo, JJ., concur.
ORDERED that the order is affirmed, without costs.



Footnotes

Footnote 1: On appeal, the Fourth Department modified the judgment of conviction by reversing the father's conviction for murder in the second degree, but it affirmed his conviction for murder in the first degree.

Footnote 2: The trust is governed by three independent cotrustees, none of whom are the aunt or the uncle.

Footnote 3: To the extent that the grandfather contends that Surrogate's Court erred in not signing two separate judicial subpoenas duces tecum, said subpoenas were not included in the record before us and the record is otherwise silent with respect to the court's determination in this regard; thus, we find that this issue has not been adequately preserved for appellate review (see generally Matter of Hoover, 182 AD3d 685, 687-688 [2020]).

Footnote 4: To the extent that the grandfather challenges the aunt's use of certain trust fund disbursements as well as the foster care stipend that she receives for providing foster care services to the children, we note that these expenditures are not relevant to the instant guardianship proceeding as these funds are separately regulated and disbursed pursuant to the terms of the trust and the state's regulatory scheme for reimbursements for foster care services, respectively.

Footnote 5: The aunt also voluntarily deposited a portion of the proceeds from a 2018 golf tournament into the children's trust.